Argued May 9, decided July 2, modified on rehearing July 30, 1912.

# LITTLE WALLA WALLA IRR. CO. v. FINIS IRR. CO.

[124 Pac. 666: 125 Pac. 270.]

WATERS—IRRIGATION—EXTENT OF RIGHT.

1. The actual amount of water needed for the use to which it is to be applied is the limit to which a party is entitled to water for irrigation, regardless of the fact that he may have actually diverted much more water for a long period of time.

WATERS—IRRIGATION—AMOUNT REQUIRED—DETERMINATION.

2. The amount of water required for irrigation per acre depends on the character of the soil, the climate, and other conditions, as well as the manner of its application.

WATERS—IRRIGATION—METHODS OF APPLICATION—WASTE.

3. Where old settlers acquired the right to use water for irrigation under the Federal statute of 1866 and applied the same by inexpensive methods, they could not be required to install new methods that would reduce to a minimum the amount of water necessary, at a cost that would absorb their profits, because the method used was to some extent extravagant in the use of water.

WATERS—APPROPRIATION OF WATER—ADVERSE USE.

4. To establish title to running water against a prior appropriation, it is necessary to show a continuous use for 10 years under claim of title, and that such use deprived the person from whom the adverse title is claimed to have been acquired of water to which he was entitled, and for which diversion he would have a cause of action.

WATERS—IRRIGATION—APPROPRIATION—RIPARIAN RIGHTS.

5. Claimants of water for irrigation by virtue of a prior appropriation thereby waived any rights which they may have had to use the water by reason of their being riparian proprietors.

WATERS—IRRIGATION—RIPARIAN RIGHTS.

6. The extent of a riparian owner's right to use water for irrigation is indefinite, uncertain, and subject to fluctuation, as it must always be dependent on the future like needs of other riparian owners; there being no priority of right between them, and no riparian ownership of a definite amount of water as against other riparian owners.

WATERS—DIVERSION—"APPROPRIATION."

7. The diversion of a definite quantity of water from the channel of a stream by the owner of land on the stream claiming right thereto as against other users not prior in time is a claim by "appropriation," regardless of whether the water is diverted from the channel on his riparian land or beyond its boundaries.

WATERS—IRRIGATION—ADMEASUREMENT OF AMOUNT.

8. Where the rights to water appropriated for irrigation purposes were in conflict, the amount to which the respective parties are entitled must

be measured at the point of diversion from the stream, in the absence
of evidence showing the amount of loss by seepage and evaporation.

From Umatilla: HENRY J. BEAN, Judge.

Statement by MR. CHIEF JUSTICE EAKIN.

This is a suit by the Little Walla Walla Irrigation Company, a corporation, and others, against the Finis Irrigation Company, a corporation, and others. The facts are as follows:

About the 24th day of February, 1905, the Peacock Mill Company, the owner of two flouring mills situated on the Walla Walla River, between the towns of Milton and Freewater, began a suit against a large number of users of the water of the river above the head of its millrace, including most of the defendants in the above-entitled suit, for the purpose of having the amount and priority of its water right for mill power adjudicated, and to enjoin the defendants from interfering therewith. That suit was put at issue and some evidence taken. On August 5, 1905, the plaintiffs in the above-entitled suit, who are users of water from the river below the head of the mill company's race, and therefore not parties to the mill company's suit, commenced this suit against the defendants in the mill company's suit and others, which was also put at issue and some evidence taken. On March 13, 1909, the Peacock Mill Company filed a complaint in intervention in this suit, pleading the same facts as were set up in the first suit. Thereupon the suits were consolidated and tried as one case under the above title.

There are more than 300 parties to the suit, and the pleadings are very voluminous, consisting of nearly 2,000 pages. The facts as to the parties, the description of their respective lands, the amount of land irrigated, and the approximate time of their several appropriations are agreed upon and set out in a book of data, consisting of about 500 pages. About 3,000 pages of additional

testimony was taken, and it appears that there are five principal ditches—the Milton, the Perkins, the Stillman, the Loundagin, and the Eastside. Each of these ditches serves many defendants and diverts water from the river above the head of the mill company's race. Many other defendants who take water directly from the stream or by ditch are considered individually.

For the purpose of this appeal we have not found it necessary to consider the relative rights of the individual defendants, but we have examined their individual rights in determining the quantity of water that should be decreed to each ditch or to individuals taking water directly from the stream, and their priority of right against the mill company's appropriations. During the year 1905, commencing about September 1, for the purposes of this suit, an expert from the State Engineer's office was upon the field and measured the water in the river, the ditches, and the millrace four or five times a month. The points of measurement are marked and numbered on the maps, and are tabulated by "Stations," of which there are more than 70. He also measured the irrigated areas. These measurements are embodied in the book of data. The Walla Walla River divides at a point in the town of Milton, known here as "Station 26," the east branch being called the "Tum-a-Lum" and the west the "Little Walla Walla." The latter also divides into many branches, spreading over a large area. Upon the completion of the testimony the circuit court made its findings and rendered a decree thereon, adjudging the rights of all the parties. The mill company was not satisfied with the result, and the defendants on the Tum-a-Lum branch were dissatisfied with the amount of water allowed to them, and both have appealed.

MODIFIED.

For appellants there was a brief and oral arguments by *Mr. Carey M. Rader* and *Mr. Will R. King.*

For cross-appellants there was a brief over the names of *Messrs. Raley & Raley, Mr. R. R. Johnson,* and *Mr. Joseph M. Strable,* with an oral argument by *Mr. James H. Raley.*

For non-appealing defendants there was a brief over the names of *Mr. James A. Fee, Mr. Samuel D. Peterson, Mr. Robert J. Slater, Mr. Stephen A. Lowell, Mr. W. F. Crowe, Mr. T. P. Gose, Messrs. Sharpstein & Sharpstein,* and *Mr. Cecil T. Godwin,* with oral arguments by *Mr. Fee, Mr. Peterson, Mr. Slater,* and *Mr. Lowell.*

For the State of Oregon there was a brief with oral arguments by *Mr. Andrew M. Crawford,* Attorney General, and *Mr. Sam E. VanVactor,* District Attorney.

Opinion by MR. CHIEF JUSTICE EAKIN.

1. There is great conflict in the testimony as to the duty of water on this land, namely, the actual amount needed for the use to which it is to be applied, and this is the limit to which a party is entitled, regardless of the fact that he may have actually diverted much more water for a long period of time.

2. Neither the law nor the decisions of the courts have fixed a definite or uniform amount as constituting the duty of water for irrigation in all cases, but it depends upon the character of the soil, the climate, and other conditions, as well as the manner of its application. There is no doubt that the methods of irrigation in Eastern Oregon have not been so economical as to obtain the best results with the least amount of water, and when conservative methods are adopted it may be found that much less water is necessary than has generally been used. In many cases which have been presented to the courts the testimony has tended to establish, and the courts have allowed, for the average soil, such as loam, clay, or sagebrush land, one inch to the acre. In a few cases where

the soil has been gravelly or upon a gravelly subsoil, as much as two inches to the acre has been contended for and allowed. This has been based on the testimony as to the need, when used under the ordinary methods then in vogue, in which little attention was paid to systematic or economical application of the water. It is the policy of the law that the best methods should be used and no person allowed more water than is necessary, when properly applied, and thus a larger acreage may be made productive by its extended application. However, the difficulty is to determine just the amount of water which will produce the best results under proper methods in each particular case, and this cannot be actually determined until tested by a practical demonstration.

3. In this case we have a large body of land which has been irrigated almost a lifetime. These old settlers took advantage of the United States statute of 1866, authorizing settlers to acquire title to the use of water in this manner, and they have secured it, at least to the amount needed and used, and now an effort is being made to reduce the amount to which they supposed their title was perfect. Their methods of use have been those which were the least expensive, and, no doubt, to some extent were extravagant, yet they cannot be expected to install methods now that might reduce to a minimum the amount of water necessary, at a cost that would absorb the profits. A great saving in the amount of water may be possible by adopting the Government reclamation methods (cited as authority here) of cement ditches, to prevent both seepage and evaporation, with experts to follow and apply the water, by which it is contended that a half inch to the acre is sufficient; but at this time it is to some extent an experiment whether the investment on that basis will be remunerative, at least on the small farms. Furthermore, these Government projects are for a new and an original use of water, upon which the Govern-

ment can impose such terms as it may see fit. Here the users have acquired the land and applied the water, which are valuable under present conditions, and their rights therein are vested, and we can require them only to use the water economically and reduce the quantity to a minimum by reasonable and cheap methods according to their situation and condition.

There are more than 300 owners of small tracts along this river, and a few of them only town lots. With but few exceptions the tracts are less than 10 acres, probably a great bulk of them less than five acres, which the owners seek to make lucrative by raising fruits, berries, and vegetables. Upon such small tracts more water to the acre is needed than on larger tracts, and a great expense in the method of conveying and applying the water cannot be afforded.

In the month of May there are about 10,000 inches of water (250 second feet) in the Walla Walla River at a point one-fourth of a mile above the City of Milton. In June there are 185 second feet, and the amount gradually decreases through June, July, and August to about 100 second feet. Above this point there are nearly 700 acres irrigated; below, there are about 2,500 acres. All, or nearly all, of these 3,200 acres are more or less gravelly, much of it very gravelly. As the valley widens below Milton (where probably it is not more than 80 rods wide), the river divides into many small channels. At a distance of three or four miles north and west, the water sinks, and a few miles farther down the valley it again comes to the surface in the channels in quite large streams. The tendency of the water to sink is indicated by what is known as the Rogers underground ditch. Mr. Rogers has a tile underground ditch a distance of one-fourth mile. Where it emerges on his place the flow is, at times, as much as 1.43 second feet, and most of the time it is

Sig. 12

more than .50 second feet, which, he testified, furnishes
no water in the winter or when the water is confined to
the channel of the stream; and that it flows the greatest
quantity when irrigation is most extensive, indicating
that there is a great loss from seepage from the ditches
and irrigated ground.    It is apparent that the ground
in question requires much more water than would be
required for loam or other fine soils.

C. L. Swain and O. L. Waller, who were called by plain-
tiffs as witnesses, are experts in the measurement of
water; but their knowledge of the duty of water is
derived largely from hearsay, theory, and observation of
its use upon land in another locality.    They fix the amount
of water needed upon volcanic ash land as one-half inch
to the acre; but upon other soil of the valley from one
and one-half to two inches; upon coarse gravelly soil,
two inches to the acre.    Other witnesses, not experts in
measuring or estimating water, but with experience in
applying it in irrigation, testify that the ground needs
more than one and one-half inches.    Plaintiffs cite the
testimony of A. Miller, as to the need of water on his
volcanic ash land; but in his case the water is raised
directly upon the land and is carried for distribution in
board gutters, so that there is little if any loss by seep-
age or evaporation, which fact must be taken into account
in considering his estimates.    The 250 gallons per minute,
raised by his pump, equals .554 second feet or .31 inches
per acre, so that his testimony as to the amount needed
on the land under the Milton ditch does not vary much
from that of Swain and others, viz., one and one-half
inches.

The lands of Rogers and Shaw, who testified to the
amount of water they use, and the amount needed, are
located down the valley where the subsoil is full of water
from the irrigation above, as indicated by the Rogers
underground ditch, above mentioned.    As to the smaller

tracts, several in one locality should rotate in the use of water, so that each may have a larger head while applying it, with less waste. Although there may be some tracts that need less water than others, they have not been segregated or identified, and we find that, except as to the Miller tract, an inch and a half, miner's measurement under six-inch pressure, per acre, is necessary and sufficient to irrigate the lands of the defendants, except tracts in vegetables and small fruits, which require two inches to the acre.

The Peacock Mill Company is the owner of two flouring mills—the Peacock and the Eagle. The former is situated about 40 rods south of the northwest corner of the southwest quarter of section 1, township 5 north, range 35 east, and the latter is in section 2, a little south of the northeast corner of the section. The millrace takes the water from the Little Walla Walla branch at Station 68, which is about 40 rods north of the southeast corner of the southwest quarter of section 1, and at the point where the tailrace of the Peacock mill empties into the river, near the north line of the southwest quarter of section 1, the water is taken up again in the race that supplies the Eagle mill, but the diversion for both mills is at Station 68; the same water furnishing power for both mills.

There appears to be a great loss of water in some manner in the mill company's race and flume between Stations 68 and 67, which latter is at the Peacock mill; and also between Stations 68 and 66, which latter is at the head of the flume, as shown by the measurements, varying from 200 to 660 inches. Also, witnesses testify to a great loss of water by leakage and overflow. Much of the water thus lost may find its way to the river and benefit the people below; but the mill company should exercise the diligence it asks of the defendants and take the water to the mills with a minimum loss. There is no

definite information in the records as to the amount of water diverted by the mill company in 1888. Only estimates are given of the amount as compared with the present flow, and opinions as to the comparative size of the race and flume are neither definite nor very satisfactory. One of the owners of the mill, at the time it was built, testifies that they did not require all the water turned into the flume to properly operate the mill until they increased its capacity. We are not given the amount of fall at the penstock, at either mill, nor the size of the gates in the wheel. The engineer measured the water in the flume at Station 67, 30 feet above the waste gate at the Peacock mill, several times each month during the year commencing with September, 1905. More than 50 measurements were made during that time, and in only five of these did the quantity of water exceed 3,000 inches; the largest quantity being 3,240 inches. The average from October to May, inclusive, was 2,560 inches (64 second feet), and yet plaintiffs' miller testifies that its use of the water was only affected by diversions by the defendants during the months of July, August, and September. The witnesses are not agreed as to the amount the quantity was increased subsequent to 1888, nor as to the time of such increase; some claiming the increase was made in 1894, and others that it was in 1898 or 1900. The capacity of the mill was greatly increased by the change of machinery and additions thereto in 1898. Later the wheel was changed from a Leffel to a Sampson turbine, which latter, the miller says, is a smaller wheel and may take a little more water, but gives greater power. He says the Leffel wheel was from 98 to 104 horsepower. With a head of 15 feet at the wheel, 2,750 inches of water would represent 118 horsepower, and counting 80 per cent efficiency would furnish 93 horsepower. If the head of water is 20 feet, it would furnish 124 horsepower, and 2,250 inches of water would furnish 101 horsepower.

Higbee Harris, a witness for plaintiff, a large stockholder in the mill company, who built the Eagle mill and became interested in the Peacock Mill Company in 1898, and in 1900 increased his holdings in the company, seems to be in a position to know the facts in regard to these changes and dates. He says that the increase in the capacity of the mill was in 1898; that it was about that time, or a little later, that the capacity of the flume was increased by the addition of an eight-inch board on the sides. (Another witness says it was a 10-inch board.) We think that the amount of water to which the mill company has been entitled, since the increase of capacity, is 2,750 inches; that at that time there was an increase of water in the flume, probably 500 inches; and that the mill company originally diverted about 2,250 inches.

We find that the mill company was an appropriator of 2,250 inches of water of the Walla Walla River for power purposes on January 1, 1888, and an additional 500 inches in 1898, the appropriation being made at Station 68; or, if that quantity does not flow in the Little Walla Walla at Station 68, then at Station 26, the point of division between the Tum-a-Lum branch and the Little Walla Walla branch.

4. Several of the defendants by their answers plead title to the water by adverse use, but they have not established such title. To constitute such title to running water against a prior appropriation, it is necessary to show a continuous use for a period of 10 years under a claim of title, and to establish that such use deprived the person from whom the adverse title is claimed to have been acquired of water to which he was entitled, and for which diversion he would have a cause of action. Such an infringement has not been established by the evidence. See *Davis* v. *Chamberlain,* 51 Or. 304, 317 (98 Pac. 154). This question is fully discussed in *Ison* v.

*Sturgill,* 57 Or. 109, 118 (109 Pac. 579: 110 Pac. 535), where the former Oregon cases are cited.

5. Some of the defendants are claiming as riparian proprietors, but their contention is for a definite quantity of water by reason of diversion and use. It is the settled law in this State that the right to divert a definite quantity of water from a stream upon riparian lands is acquired by appropriation, and the owner thereby waives his riparian right. *Davis* v. *Chamberlain,* 51 Or. 304, 317 (98 Pac. 154), and cases there cited.

6. The extent of a riparian owner's right to the use of water for irrigation is necessarily indefinite, uncertain, and subject to fluctuations, as it must always be dependent upon the future like needs of other riparian owners, as there can be no priority of right between them, and no riparian ownership of a definite amount of water as against other riparian owners. See *Caviness* v. *La Grande Irrigation Co.,* 60 Or. 410 (119 Pac. 731).

7. The diversion of a definite quantity of water from the channel of a stream by the owner of land on the stream claiming the right thereto, as against other users not prior in time, is a claim by appropriation regardless of whether the water is diverted from the channel upon his riparian land or beyond its boundaries. See the opinion of Mr. Justice MOORE in *Brown* v. *Baker,* 39 Or. 69 (65 Pac. 799: 66 Pac. 193).

The Tum-a-Lum defendants plead the decree, rendered in 1872 by the circuit court for Umatilla County in the case of *McCoy* v. *Hardesty,* as a final division of the water between the Little Walla Walla River and the Tum-a-Lum branch. That was a suit to settle the riparian rights between the owners upon the two branches, and adjudicates no individual rights nor any of the rights involved here. Although the Tum-a-Lum defendants contend for riparian rights under this decree, yet, as heretofore outlined in this opinion, they are claiming title

to the water for which they are contending by prior appropriation, and thereby waive their riparian rights, and that decree cannot aid them. Neither is it important to decide what amount of water would, unmolested or anciently did, flow in the Tum-a-Lum branch. The parties to this suit are entitled to the water of the Walla Walla River appropriated for a needful purpose according to their priority, regardless of the branch from which it is taken. If the plaintiffs or any of them have appropriated water from the Little Walla Walla branch, and that branch was not naturally entitled to so much, then the excess of the appropriation should be considered as taken from the Tum-a-Lum branch at the point of division between them, immediately below Station 26; and this is true also of the water taken by the Milton Ditch Company's ditch and the Cockburn and other ditches from the Nichols branch. If not a natural channel, the water should be considered as diverted at the head of the Nichols branch immediately below Station 1 on the river. The water was taken and used through these ditches, and, if not taken at the point stated as the head of the ditch, then the channel, through which the water reaches the ditch, will be deemed a part of the ditch from the point where it leaves the stream. Therefore the only controversy here relates to the need, the amount of appropriation, and the priority of diversion.

One of the principal contentions on this appeal relates to the amount of water required to the acre for irrigation. There is no controversy between the owners of these ditches as to the relative rights of the users, nor as to the amount of land entitled to water, the controversy being as to the duty of water thereon, and the relative priority of each user as against the Peacock Mill Company.

There are 91 owners in the Milton ditch, representing 407.79 acres of land served with water from the ditch.

These owners are named and their lands described in the findings of the circuit court and need not be repeated here. They appropriated water through the Milton ditch for the irrigation of 268.33 acres prior in time to the appropriation by the mill company in 1888, and for 141.48 acres subsequent to 1888 and prior to the second appropriation of the Peacock Mill Company in 1898. Of the whole amount of land irrigated, 85 acres are in vegetables and small fruits.

We conclude that the Milton Ditch Company's ditch is entitled to 445 inches, miner's measurement, prior in time to the appropriation by the Peacock Mill Company in the year 1888; and to an additional 215.25 inches prior in time to the second appropriation of the Peacock Mill Company in 1898.

As to the duty of water on the A. Miller land (the volcanic ash land), it appears from the book of data, p. 320, sheet 16, No. 21, that 10 acres of his land is valley land, and 50 acres bench land, which is irrigated from the Tum-a-Lum branch by means of a pump with a capacity of 250 gallons per minute, which for 24 hours is equal to 22.23 miner's inches, under six-inch pressure, or .554 second feet; but pumping only 18 hours a day, as allowed by the court, equals 16.66 inches, and used upon 50 acres would be one-third of an inch to the acre instead of one-fifth, as contended by plaintiffs, or .222 of an inch per acre for 75 acres.

We find that Miller is entitled to water to the amount of 250 gallons per minute for 24 hours a day for the land on the hill in section 1, township 5 north, range 35 east, or 22.23 miner's inches. That the defendant interveners, J. D. McCoy, B. M. Johnson, Mary A. McCoy, and I. Heidenreich, are claiming water through a natural channel known as "Little Stream," a branch of the Tum-a-Lum, upon which their lands are riparian, for domestic use and stock water. They are entitled to sufficient water

for that purpose, in their riparian rights as against both the plaintiffs and the other defendants, as superior to any appropriation or diversions. The record does not show what amount of water in the natural channel will be required to reach their premises, but we will allow 50 inches.

There are 50 defendants known as the Tum-a-Lum branch defendants, taking water from that branch by means of the Eastside Ditch Company's ditch, the Loundagin Ditch Company's ditch, and those taking water directly from the channel, namely: Wm. H. Wilmot, W. S. Barnes, Woodson Cummins, Sam Lynd, J. W. Jenkins, Herman Wolf, H. B. Perkins, and A. Miller, by means of which they irrigate 416.52 acres of land; and J. D. McCoy, B. M. Johnson, Mary A. McCoy, and I. Heidenreich, riparian owners, taking water for domestic use. The appropriation for the following acreage thereof is prior in time to the appropriation of the Peacock Mill Company made in 1888, namely, 22.31 acres directly from the channel, 49 acres by the Loundagin ditch, and 98.14 acres by the Eastside ditch. For the following acreage the appropriation was subsequent to 1888 but prior to the appropriation by the mill company in 1898, namely: 29.81 acres, diverted from the channel; 60 acres by the Loundagin ditch, and 157 acres by the Eastside ditch. Of these amounts 106.21 are cultivated to vegetables and small fruits.

In addition to the above amounts, A. Miller is entitled to 22.23 inches, the amount diverted by him by means of his pumping plant, and prior in time to the appropriation by the mill company in 1898; and the McCoys, Johnson, and Heidenreich are entitled to 50 inches for domestic use. That is to say, that the defendants above referred to as the Tum-a-Lum defendants are entitled to 307.27 inches, miner's measurement under six-inch pressure, prior in time to the appropriation by the Pea-

cock Mill Company in 1888, and 444 like inches prior to the mill company's appropriation in 1898.

The Stillman ditch has a capacity of 10 second feet and diverts water from the Little Walla. Walla branch above the head of the Peacock Mill Company's race, at Station 35, by means of which 108.33 acres are irrigated. The appropriation for 30 acres thereof is prior in time to the appropriation made by the mill company in 1888, and 25.19 acres are subsequent thereto and prior to the mill company's appropriation of 1898. There are 24 acres in garden. The appropriation for the remainder of the 108.33 acres is subsequent in time to the mill company's appropriation of 1898. Therefore the Stillman ditch is entitled to 57 inches of water prior in time to the mill company's appropriation in 1888, and 37.78 inches prior to the mill company's appropriation of 1898.

The Perkins ditch takes water from the Little Walla Walla branch above the Peacock mill, but below the head of the millrace, and flows through and across the mill-race immediately below the Peacock mill. By stipulation with the mill company, the water adjudged to this ditch shall hereafter be conveyed through the millrace to a point where it now crosses the tailrace of the mill company. There are 29 users of water under this ditch, irrigating 66.37 acres therefrom, of which 16.43 acres are in gardens and small fruits. The appropriation for 42.50 acres was made prior to the mill company's appropriation in 1888, and 18.75 acres were appropriated subsequent to 1888, and prior to the mill company's appropriation in 1898, namely, the Perkins Ditch Company has a prior right as against the mill company to 77.20 inches of water, miner's measurement, and to 28 inches of water prior to the mill company's appropriation in 1898.

Defendants Martha Hudson, E. D. Walker, Jennie Walker, Lucetta Romine, and Agnes R. Salt divert water from the Little Walla Walla branch above the millrace

and below Station 1 on the river, for the irrigation of their land, the appropriation for 21.33 acres of which was made prior to the year 1888, viz., 32 inches of water, and six acres prior to 1898, viz., nine inches of water.

There are about 50 defendants known as the "Up-River defendants," who use water from the Walla Walla River. Their lands are situated on the river above Station 1, which is above the head of the Milton and the Cockburn ditches, and the water used by them is not included by the measurements of the flow of the water at Station 1. They irrigate 697 acres, of which 93 acres are in garden. Four hundred and seventy-two acres have been irrigated since prior to January, 1888, and 216 acres since prior to 1898, their appropriations for which were 732 inches prior in time to the mill company's appropriation in 1888 and 324 inches prior to the appropriation of the mill company in 1898.

There are 14 defendants referred to as the Cockburn defendants who take water from the Nichols branch above the town of Milton and below Station 1, and who have a right to the water for the irrigation of 30 acres prior in time to the mill company's first appropriation, namely, 45 inches of water.

There are 33 defendants who irrigate about 271 acres directly from the streams below the head of the millrace, 77 acres of which are in gardens. The appropriation of water for 113 acres thereof is prior to the year 1888, and for 110 acres it was prior to 1898, namely, 209.42 inches prior to 1888 and 165 inches prior to 1898. These defendants have no conflict with the mill company, as their needs are supplied from the water passing through the millrace.

Thirty-one individual plaintiffs claim water from the Walla Walla River but divert the same below the point of diversion by the mill company. They irrigate about 481 acres. For 192 acres the appropriation was prior to

1888, viz., 288 inches, and for 95 acres the appropriation was prior to 1898, viz., 142.50 inches. The amount of water passing through the mill company's race must pass to them after serving the mills, which is more than sufficient for all of plaintiffs and the defendants last above mentioned, diverting water below the millrace.

The second finding by the circuit court (page 354 of the record) as to the date of the appropriation by J. A. Rogers is hereby corrected to conform to the facts in the book of data on page 14 to read: That 10 acres of this land has been irrigated for 30 years; nine acres for 14 years; and one acre for four years; and the decree modified accordingly. This land is included in the allowance to users from the Little Walla Walla below the mill.

There is also an error in finding No. 22, on page 295 of the record, as to James Harris. The tract described is in section 20, township 5 north, range 36 east, and not under the Stillman ditch, and contains 10 acres instead of 1.23. See data, p. 348. He is an Up-River defendant. There is a James Harris who owns two tracts under the Stillman ditch. See data, pp. 350-352. Finding 22 is amended to read: 6.48 acres have been irrigated more than 20 years (allowance for this is included with the. Up-River defendants) ; and on page 338 the finding as to James Harris should include two tracts (sheet 16, Nos. 1 and 3, 2.16 acres under the Stillman ditch), which is included in the allowance to the Stillman ditch.

Summary: The defendants taking water below Station 1 and above Station 68, the head of the millrace, have a first right to 931.47 inches of water, miner's measurement under six-inch pressure. The Peacock Mill Company has the second right to 2,250 inches as of date January 1, 1888. The last-mentioned defendants are entitled to the third right to 722 inches prior in right to the mill company's appropriation in 1898. And the mill company is entitled to an additional 500 inches as of

date 1898.   There have been additional appropriations by various of defendants made subsequent to 1898 not affected by this appeal.   The measurements at Station 1 show that, except during the month of August, there was water sufficient to supply the mill company and these defendants the whole amount adjudged to them.   The Up-River defendants are entitled to 732 inches prior in right to the mill company and 324 inches prior in right to the mill company's second appropriation in 1898.

Subject to the modifications herein made, the decree of the circuit court is affirmed.

MR. JUSTICE BEAN took no part in this decision.

MODIFIED.

Decided   July   30,   1912.

ON PETITION FOR REHEARING.

[125 Pac. 270.]

Opinion by MR. CHIEF JUSTICE EAKIN.

Defendants Orpha Johnson and others move the court to correct errors in the original decree of the circuit court affecting their property.

A tract of land belonging to Orpha Johnson is errone-ously adjudged as entitled to water from the Perkins ditch.   Finding 11, p. 279, record.   The finding describes two tracts.   The second tract is situated in the southwest quarter of the southeast quarter of section 35, township 6 north, range 35 east, and is irrigated from the Powell ditch, and the finding is hereby corrected to read:

"The said 7.50 acres have for 20 years been irrigated from the Little Walla Walla River, through the Powell ditch; 6.29 acres thereof being in garden and small fruits."

And such tract is added to and included in the 271 acres of the 33 defendants mentioned in the former opinion of this court (124 Pac. 672).

R. B. Lawler is the owner of 1.39 acres of land in section 2, township 5 north, range 35 east, which has been irrigated for six years from the Powell ditch. This was omitted from the circuit court's decree, and it is hereby corrected to include the same, and is added to and included with the land of the 33 defendants, mentioned in the former opinion of this court.

Elvira Sanders and Charlotte Tanke are plaintiffs in the complaint of the Little Walla Walla Irrigation Union, and the owners of 10 acres of land in section 25, township 6 north, range 35 east, and their rights are adjudicated in finding 32 on page 372 of the record. It now appears that their interests have been transferred to Geo. B. Dexter, who was originally made a defendant as to other lands, and the decree is hereby corrected, substituting Dexter for Sanders and Tanke, in the water rights decreed to such 10 acres, and is included with the 31 plaintiffs on page 14 of the opinion of this court.

Jay Holman is the owner of .51 of an acre of land, all in garden, in the northwest quarter of the northeast quarter of section 25, township 6 north, range 35 east, which has been irrigated from the Powell ditch for 15 years. This was omitted from the decree, and it is hereby added to and included in the land of the 33 defendants, who irrigate 271 acres directly from the stream mentioned on page 13 of the opinion of this court.

Fannie Holman's 10 acres are adjudicated in the findings of the circuit court at page 351 of the record as irrigated from the Little Walla Walla, as shown by book of data, p. 32, being No. 29 on sheet 13, and is included with the 33 defendants mentioned in the former opinion of this court.

The Milton Irrigation Company, Perkins Irrigation Ditch Company, and the Tum-a-Lum, defendants, ask the court to specify the point at which the water allotted to their several ditches shall be measured to them, whether

at the head of the ditch or at the point at which it is delivered from the ditch, and, if the former, to allow an additional amount for loss by seepage and evapora-tion.   In determining the amount of water to which the various parties, both plaintiffs and defendants, are entitled, and in determining the amount needed for an acre, the amount of loss by seepage and evaporation was taken into account.   The manner of arriving at the amount needed per acre by the witnesses, both the user and the experts, was largely by reference to the measure-ments or estimates at the head of the ditches, and the same is true of the millrace where the loss will ordinarily be much greater from a flume than from a ditch.   There is no testimony as to the amount of loss from these causes, but in an ordinary ditch, where the distribution of water to users begins at its head and the length of the ditch is only one, two, or three miles, the per cent of loss is small, and should be shared proportionately by all.   The United States Department of Agriculture gives the result of investigation as. to such loss, and it ranges from 1 to 2 and 3 per cent per mile.   In one ditch mentioned the loss was 14 per cent per mile, but with a 2 per cent loss per mile in a ditch three miles long, the water being taken from it the whole distance, the average loss for the whole ditch would not exceed 3 per cent.   However, we have no data upon which to fix the per cent of loss on any of these ditches, and in arriving at the conclu-sions of the opinion we considered this element, both as to the mill and the irrigation ditches, and the amount of the appropriation of the respective parties hereto as here determined shall be measured at the point of diver-sion from the stream.

With the corrections mentioned, the opinion is adhered to, each party to pay his own costs in this court.

CORRECTIONS MADE IN DECREE OF CIRCUIT COURT.

FORMER OPINION ADHERED TO.